ROANE, Judge.
In the year 1787, the Legislature passed an act, altering the course of descents. This act related only to lands; and was part of a system commenced with a view of conforming our laws to the genius of our government, and abolishing the feudal and monarchical principles derived to us, therein, from the parent government of Britain. The great principle of the law was, to lose sight of the stock from whence the land descended, (or, in the feudal language, the blood of the first purchaser,) and, considering the person last seised as the absolute owner of the land, to make that will for him, in case of intestacy, which the natural affections of mankind authorise us to infer, he would have made for himself: Eor instance, the descent was ordained to the father or the mother, in preference to collateral relations on the part of the mother or father, as the case may be. Ho person acquainted with the feelings of human nature can say, that this canon of descent was not conformable with the general policy of that law; none can pretend that a father or mother is, in respect *of the son, a stranger, or that he or she would not have been preferred, by him, to a collateral kinsman of the other line.
• Thus the law stood as to real property; and an act of the same session adopted, by reference, the same canons, for the distribution of personal estate: both laws were founded on the justest and truest principles, which ought ever to govern the Legislature, until they forget that the son was the owner of the property; and that no human being is more dear to him than his father or mother.
In the year 1790, [c. 13, $ 3, 4, 13 Stat. Larg. 123,] however, the descent law was altered, and it was enacted, that where an infant shall die, without issue, having title to any real estate of inheritance, derived by purchase, or descent, from the father, the mother of such infant should not succeed thereto, if there be certain relations (specifying them,) on the part of the father, this provision is reciprocated, to the case of land coming on the part of the mother; with a saving of the right of dower and curtesy, as the case may be. Every person at all conversant with the law, will readily perceive, that the terms real éstate of inheritance, purchase, descent, dower, and curtesy, are wholly inapplicable to chattels, however adapted to lands: But, I will pass on, from this argument, to others deemed of greater efficacy.
Habituated to respect the Legislature of our country, I have, nevertheless, no hesitation to say, that this law of 1790, was anti-republican and aristocratic; founded on false principles, and on a total dereliction of the policy of the act of 1785. It was anti-republican and aristocratic, because it tended to keep up the wealth of families; and so contravene the wise policy Which-annihilated entails in 1776. It was founded on false principles, because it forgot that the infant was the owner of the property, and had respect only to those from whom he had derived it, who had parted with the ^interest therein, and with relation to whom, only, the mother or father, as the case may be, can be considered as a stranger, and because it made a disposition for the infant, which he never would have made for himself; and which the Legislature did not pretend to set up, for those who were, themselves, capable of disposition.
This act of 1790, however, although the act of distributions was then in the particular contemplation of the Legislature, and in fact amended by it in another instance, did not extend this provision to the case of chattels; and good reason will presently appear why it did not.
In 1792, the Legislature revised our laws. It was the object of that Legislature to simplif3r, not to alter those laws; and, in a case of doubtful construction, this acknowledged design of the Legislature, will be permitted to have its weight.
In this session of 1792, [c. 93, R. C. ed. 1803,] an act was passed, to reduce into one, the several acts concerning descents; incorporating, among the rest, the provisions before stated, of the act of 1790; and a distribution law, of the same session, referring to the act just mentioned, by its title, enacts, that the surplus of chattels shall be distributed, to the same persons, and in the same proportions, as lands are directed to descend in, by that act: And the present question is, whether this reference adopts the canons of descents, as applicable to personal chattels, only as a general rule, to be varied as other laws on that subject, and the nature of chattels in certain instances may require; or establishes them as an universal rule, for distributing chat *459 tels, comprehending' all cases, and adopting the aforesaid provision, among the rest.
The former construction involves us in no difficulty whatever: The latter presents consequences which none can foresee or estimate.
*1 adopt the former construction, for the following reasons: 1st. Because, it was supposed that the Legislature of 1792, did not mean to extend this provision to chattels, on account of the consequences which would ensue, some of which will be now stated; because, the general design of that Assembly was not to alter the laws; and because a mistake probably arose in the present respect, by referring to the descent law, by its title, instead of enacting the provisions intended, totidem verbis.
2d. Because, even an unequivocal expression, by the Legislature, may be controlled by consequences, and the reason of the law, taken on a general view; and a fortiori, in a case of general or doubtful expression.
3d. Because, the provision, as relative to the lands, is founded only on the idea of the party’s being intestable, which, in that case, continues till the age of 21; whereas, he is testable of chattels at 18: The reason and ground of the law, therefore, as applicable to lands, ceases, at least in part, as applying to chattels.
4th. Because, although the act is reciprocal as to lands, i. e. extends to lands descending from the mother, as well as from the father, yet, from the nature of that property, in respect to the rights of the husband, no inconvenience will ensue from such extension: whereas, in relation to chattels, such extension cannot exist without infringing the right of the husband-to take, absolutely, the personal estate of his wife. If such right exists in him, a descent of chattels to his wife’s child, as from her, can never exist. A moiety of the cases, therefore, contemplated by the provision, can never take place in respect of chattels, without repealing the general law, vesting the wife’s property in her husband: A dilemma consequently exists in this particular; the consequences of which, either way, are very operative, in opposing the construction which has obtained. If, as I clearly suppose, the *right of the husband to his wife’s personal estate, cannot be affected bj' this provision ; if it applies, (and it is here to be remarked, that the husband’s right is récognised in the clause immediately following,) it follows, that the provision, although reciprocal in words, is not so in fact. I will put the case of an infant dying seised of personal estate, derived from his father, and from his mother through his father, they both being dead. Now, as the mother’s chattels, being transferred to the father by the marriage, go to the child, as from the father, it follows that the relations on the part of the mother will, in every event, be excluded, and those on the part of the father, in every event, succeed. The law, therefore, is not reciprocal, but partial; and those who admit the right of the husband, and yet contend for the provision in question, must give up that part of it which favors the mother, and thereby alter the law, so as to operate in all cases, in favor of the father.
Sth. Because, if the same rule prevails in all cases, as relative to both kinds of property, it would abridge the admitted right of aliens to take personal property, because they cannot also take lands. Besides, if the law had been enacted, e converso, i. e. if the canon had been established in the distribution law, and then referred to in the descent law, it might equally have been argued, that the right of aliens to take lands was enlarged, or rather created. But, certainly, these important innovations, in the general law on this subject, shall not, any more than the before supposed innovation in the law affecting the husband’s right to his wife’s personal estate, be affected by this side-wind construction, if another rational construction can be found.
6th. Because, all laws have reference to the subject matter thereof. Land, from its permanent nature, is capable of being traced ad infinitum; but, chattels being of a fluctuating nature, and moreover the property of some of them consisting in their use, are not traceable; and, after a lapse *of 21 years, great inconvenience as well as litigation would ensue, from attempting it. If it be said that slaves are more permanent and capable of being identified, the answer is, thát they stand upon the same foot with all chattels, and must stand or fall by a construction embracing all.
A construction besieged by such difficulties, and unavoidably producing such consequences, is entirely inadmissible.
But, it is said that the words of the act of 1792, are explicit, and must prevail. Judge Blackstone, in his position, that the reason of the law is to be consulted even in opposition to the letter, puts perhaps a stronger case than the one before us. A mischief of the common law, he says, was, that ecclesiastical persons let long leases, to the impoverishment of their successors. To remedy this, the statute of Elizabeth was made, declaring void all leases made by ecclesiastical persons for longer terms than three lives, or 21 years. 1 Black. Com. 87. Although these terms are as comprehensive as the English language can afford, it was yet holden that this act does not make such leases void, during the life of the Bishop, &c. as not being within the mischief intended to be remedied. To say the least, the application of this decision to the case before us, will exempt from the operation of the act of 1792, all cases happening after the decedent had attained 18 years of age; for, he was then testable, and may perhaps have actually made a testament. If, then, in that case, we must depart from the general rule laid down by the act, as not being within the mischief intended to be remedied, we may, in all cases, in which it is equally inapplicable ; we may withdraw personal estate from its operation altogether, for the reasons already assigned.
I am, consequently, for affirming the decree.
FLEMING, Judge.
I have not had a moment’s doubt upon this case. The language of the acts of Assembly leaves no *460 room for criticism. That, concerning the course of descents excludes the mother, *in terms, from any share in the real estate; and that, concerning distributions, passed at the same session of the Legislature, has declared, that the personal property shall be distributable in the same manner, and go to the same persons with the real estate. This fixes that the same persons are to take both estates. It is in vain, therefore, to urge the confusion and difficulties which it is said must ensue from this mode of interpreting the law; because, the Court are bound down by its positive precepts, and have no discretion in the matter. For, whatever latitude a Court may think proper to indulge, where the expressions are ambiguous, they certainly have no right to do so, when the words are clear; but, if inconveniences follow from a literal construction, they must be redressed by the Legislature, and not by the Court; who are not to torture the words in order to discover meanings which the ■Legislature never had; but, are to pursue the plain import of the statute, without regard to the consequences. I am therefore of opinion, that the decree should be reversed, and the personal estate distributed among the appellants.
CARRINGTON, Judge.
The principle of the decree is equitable, as it extends to the mother a proportion of the son’s estate; but it appears to me to be repugnant to the positive directions of the law. The terms whereof are too explicit to admit of any latitude in the construction ; which can never take place, but when the expression is doubtful, and a strict adherence to the letter might disappoint the intention of the Legislature ; and, then, the latitude is allowed to support, and not to defeat the law. Such was the case of Brown v. Turberville, where, from the ambiguity of the expression, there was danger of subverting a great part of that system of descents, which was evidently contemplated by the Legislature; and, therefore, to avoid so great a mischief, a liberal interpretation was adopted by the Court. But here, the law is expressed in terms too plain to be misunderstood, and there is nothing which leads to a conclusion, that the Legislature intended any thing more than what *they have explicitly declared. For, the | 5 of the act of 1792, concerning the course of descents, excludes the mother from a participation in any part of the real estate of her deceased infant, which was derived from the father; and by the act of the same session, concerning the distribution of intestates’ estates, it is declared, that the personal property of the decedent shall be distributed in the same proportions and to the same persons as lands are directed to descend in, and by, the first act. This declaration leaves no room to doubt; for, it is a clear expression of the Legislative will, that there shall be no distinction as to the persons who are to take, whether the estate be real or personal. The Court, therefore, has no authority to enter into equitable enquiries, when the positive meaning is so clearly expressed, but it must rest with the Legislature to correct the evil. Besides, it is very probable, that in the course of .so many years, many estates have been distributed according to the letter of the act, and that many persons have bought and sold and regulated their transactions accordingly; the mischiefs, therefore, of a contrary construction, at this time, would be incalculable. The result is, that I am of opinion, that the decree of the Chancellor should be reversed; and a decree entered, in its room, for distributing the estate among the complainants, according to the prayer of the bill.
LYONS, Judge.
The inclination of my mind would have led me to support the Chancellor’s opinion; but the words of the act of Assembly are too strong to be resisted. I think, therefore, that the decree should be reversed.
PENDLETON, President.
A testator, by will in 1797, devises to his wife a tract of land, and seven slaves in fee, and other lands for life, and supposing his wife to be pregnant, gave all the residue of his estate, real and personal, to the child or children she should bring by him. The wife had a son, who lived about eighteen months, and then died, leaving no brother or sister. The mother, intermarried with *Dillard, and after her death, administration on her estate, as well as on that of her son, was granted to Dillard, who claims the personal estate of the child. The appellants are the brothers and sisters of the testator, and of course the next of kin to the child, by his father, and being entitled under the law of descents to the lands, which came from the father, claim the personal estate, under the same predicament by the act of distributions. I will consider how the distribution would have stood before the act of 1785, what were the rights of the parties under that act, till 1792, and what is the operation of the latter act? The act of distribution prior to 1785, having disposed of an intestate’s personal estate between his wife and children, provides for contingencies happening in the family. If after the death of a father any of his children shall die intestate, without wife or 'children, in the life-time of the mother, every brother and sister, and the representatives of them, shall have an equal share with the mother; and if all the children shall so die intestate, in the life of the mother, the portion of the child dying last, shall be equally divided between the mother and the next of kin by the father; thus assimilating it to an executory devise, upon an event which must happen in the life-time of the mother, in a will, which the Legislature are supposed to be making, to accord with what would have been the will of the intestate: and the effect of this law, in the present case, would have been that the personal estate would have been divided into equal moieties, one of which would have gone to the mother, and the other to the appellants. Slaves were not then included in personals, but descended to the heir, and could not, by descent, have passed out of the father’s family. The act of 1785 made no difference between lands and personals, but gave the whole of both to the mother, if there were no brothers or sisters of the intestate, to share with her, and vested the property in the first *461 takers, without providing- for future contingencies; or enquiry how the intestate ^acquired the estate. The law of 1790 changed the descent, as to lands, in the case of an infant intestate, excluding the father and mother from any share in the lands which came to the infant from the other parent; but this made no difference as to the personal estate, which by the act of distribution in 1785, was not to follow future laws of descent as to lands, but referred to the act of that session by its title. Thus stood the law in 1792, when a new act of descents was passed, incorporating the acts of 1785 and 1790 into one; and extending the exclusion, (in the case of an infant intestate) of one parent, from a share of the estate which came from the other, to the issue of such excluded parent by another husband or wife; and, having passed that act, they proceeded to make a new act of distributions, copied, I believe, throughout, from the act of 1785, until they came to the reference to the law of descents; and that clause has these words, “If there be no wife, then the whole of such surplus, shall be distributed in the same proportion and to the same persons as lands are directed to descend in and by an act of the General Assembly, entitled an act to reduce into one, the several acts directing the course of descents;” which is the title of the new act: This was mentioned by Mr. Randolph, to be probably a mistake in the reference, for which a blank had been left in the draft of the bill, referring to the title of the new act, instead of that of 1785, from inattention, or inaccuracy in the Legislature. On reflection, that gentleman must discover that this observation applies against his argument. For, if the draftsman of the bill had meant to refer to the law of descents of 1785, he would have inserted the title of that act; but intending to refer to the new law of descents, the title of which was not then fixed, he left a blank to be filled up with such title, when known. But admit the probability of such mistake, and still it is possible, that having changed the principle as to the descent of lands, from that of 1785, they might *also mean to change it as to personals: since both were to depend upon the case of an infant intestate, and the claim to be adjusted within a short period, when it might not be so difficult to distinguish his several acquisitions of property ; which would be, generally, donations from his parents, or others; more especially, in the case of slaves, an extensive branch of personal property, which as well as lands, they might intend should be continued in the family of the father, in case there were no children; and not go into a strange family. It is observable, that the Legislature has made a distinction between slaves and other personals, in Ihe case of the widow’s dower; since, in the slaves, she has only an estate for life, whilst she has a property in the other personals: A distinction which they did not think it necessary to make in the case now under consideration; but, left the lesser to follow the greater class of personals. It rests with the Legislature to explain their intentions, which I hope they will do, to settle the law in this important point; and, in doing so, I trust they will at least allow some share to the mother, as before 1785. If the Legislature are silent upon the subject, that silence ought to be considered as an approbation of the opinion of this Court, and the point will be settled. But, the words of the law, appear to me, to be too strong to admit of any construction by this Court, as they expressly direct that the personals shall go to the same persons as lands go to, under the new law of descents, adopting the exclusion in the provisos of that law, as well as the other parts of it. For, after all, how does the intention of the Legislature stand in the comparative view of these acts? In 1785, they declared that the lands and personals of an intestate shall go the same way; and in 1792, they have declared the same thing in positive terms, although they altered the course, that both should take in certain cases, not using a word to distinguish one from the other. The reasoning of the Chancellor, (relied on by the counsel in this Court,) drawn from the words “real estate of inheritance, descent and purchase,” *used in the law of descents, have no force upon my mind; since real estates were the only subject of that law, and it would have been absurd to have used any expressions applicable to personals; but, that application is made to the latter, b}r the act of distribution ; nor do I discover that the whole of the surplus, must go one way under that act; since the whole surplus is distributed, although part shall pass to one person, and part to another. The case of Brown v. Turberville, depended upon the 5 7 of the law of descents, directing that “if there be no-mother, nor brother, nor sister, nor their descendants, and the estate shall not have been derived, either by purchase or descent, from either the father or the mother, then the inheritance should be divided into-moieties, one of which should go to the paternal, and the other to the maternal kindred. ” The intestate in that case was an adult person, and the Legislature having omitted to confine it to the case of an infant intestate, although it was the apparent intention to refer to the former parts of the law, which so confined it, the Court in construction interposed the words in the case of an infant intestate, so as to make the-clause read, “and the estate shall notin the case of an infant intestate have been derived from either father or mother,” to comply with the apparent intention in -the law; but, in this case, I can discover nothing which shews an intention to exclude personals from the proviso, in case of an infant intestate. The mother, therefore, is entitled to no part of the child’s personal estate, which came from the father; and, in my opinion, the decree ought to be reversed, and a decree entered for the appellants.
The decree was as follows: “The Court is of opinion that the act of Assembly, passed in the year 1792, for the distribution of in-testates’ estates, having enacted that, if there be no wife or children, the surplus of the personal estate shall be distributed to the same persons, and in the same proportions as lands are directed *to de~ *462 scend in and by an act of the General Assembly entitled an act reducing' into one the several acts directing the course of descents, has adopted the exceptions in the Sth and 6th sections of the said law of descents, which exclude the father and mother, and their children by another husband or wife, from succession to the lands of an infant intestate, which came to him from the other parent, as well as the rule to which they are exceptions; and extends the exclusion equally to a distributive share of the personal estate coming to the infant in the same manner. The words real estate of inheritance, descent, and purchase, used in the law of descents, and applicable only to lands, form no objection; since lands only are the subject of that act, and it would have been absurd to have used terms therein applicable to personals; but, in the act of distributions, the Legislature have declared that personals shall go to the same persons as the lands are to pass to by the law of descents: Words too plain and positive to admit of doubt or construction: and, which woull be violated, in the present case, by the mother’s taking the personal estate, and the lands going to the relations by the father; that is, such of both as came to the child from the father, for if he was entitled to any other estate of both, or either class, it will go wholly to the mother, and that the decree aforesaid is erroneous. Therefore, it is decreed and ordered, that the same be reversed and annulled, and that the appellee pay to the appellants their costs by them expended in the prosecution of the appeal aforesaid here; and, this Court proceeding to make such decree as the said High Court of Chancery should have pronounced, it is further decreed and ordered, that the appellee deliver to the appellants all the slaves of the infant intestate, which came to him from his father, and account for their profits; that, he also account with the appellants.for the other personal estate which came to the intestate in the same manner, and pay what shall be due *thereon ; and the cause is remanded to the said High Court of Chancery for accounts to be taken, and further pro • ceeding to be had therein, according to the principles of .this decree. ’ ’